[No. G036217. Fourth Dist., Div. Three. Feb. 27, 2007.]

In re MICHAEL S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL S. et al., Defendants and Appellants.

■■■■■

**COUNSEL**

Edward W. Hess, Jr., for Defendants and Appellants.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Randall Einhorn and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOORE, J.—**

I

*Introduction*

In this case we hold:

—A mother who was assessed liability of $25,000 pursuant to a Welfare and Institutions Code section 730.7[1] restitution order, based on an arson committed by her minor son, has a right of appeal from the order making her so liable. Section 730.7 specifically incorporates Civil Code section 1714.1, and judgments under section 1714.1 of the Civil Code are appealable.

■ —The acceptance by the victim of a payment from the mother's insurer in full release of all claims against the mother and son precludes any section 730.7 restitution liability on the part of the mother. There are reasons that civil settlements do not release juvenile offenders from a liability for restitution under section 730.6. (See generally *In re Tommy A.* (2005) 131 Cal.App.4th 1580 [33 Cal.Rptr.3d 103] (*Tommy A.*).) But those reasons do not apply to parents who are only vicariously liable under section 730.7. The state's interest in the rehabilitation of juvenile offenders is not implicated by a release of vicarious liability against an otherwise innocent parent. And the Legislature never intended to preclude the operative effect of releases of vicariously liable parents given by victims of their children's torts. In fact,

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

*not* giving effect to such a civil release deprives victims of an important bargaining chip, and ultimately of compensation that might come their way as well as the benefits of their rights under liability insurance contracts.

—An abstract of judgment filed against the mother indicating that she is a "judgment debtor" under a judgment in excess of $ 127,000—the amount of the restitution award against her son, under section 730.6, not the restitution award against her under section 730.7—should be expunged.

—The restitution order against the son under section 730.6 for that $127,000 is correct, despite the civil release obtained by his mother's insurer, which was also obtained on his behalf as well. It makes no difference that the order will continue on into the son's adult life. Section 730.6 contemplates that juvenile offenders themselves will make "full restitution," and that orders of restitution will continue beyond their wardship.

## II

### *Background*

In December 2003, then 15-year-old Michael S. and a friend entered a combination physical education storage shed and snack bar on the Bolsa Grande High School campus and held a lighter to one of the sit-up pads and some carpet on the inside floor of the shed. The pad and the carpet ignited. The fire got out of control and caused about $139,000 in damage.

A little more than two years later the school district accepted a payment of $11,735 made by the insurer of Catherine S., Michael's mother. The district provided a full release of all of its claims in any way growing out of the fire against Michael and his mother.

In March 2005, about the same time as the settlement, Michael was made a "ward" of the juvenile court (that is, formally found to be a juvenile delinquent and placed under the jurisdiction of the court pursuant to section 602) based on his admission to the felony arson. He was committed to juvenile hall for 30 days, and thereafter put on probation.

Later in the year a restitution hearing was held, at which Michael and his mother were present. Both were represented by the same retained attorney. The court made an order setting the restitution to be paid by Michael at about $127,000—that is, the amount of the damage after deducting the payment

from the insurer. The order also stated that "Pursuant to Civil Code 1714, maximum liability for mother is set at $25,000.00."[2]

Within two months of the court's order recognizing the mother's maximum liability at $25,000, the County of Orange filed an abstract of judgment. Only Michael's mother's name appears on the document, as "defendant" and again as "judgment debtor." Michael is not listed at all. The document states that the total amount of the judgment is $127,038.63. The document makes no reference to the trial court's express cap on Catherine's liability of $25,000. An ordinary person reading the abstract would naturally conclude that Catherine owed that entire amount. Both Michael and his mother Catherine have appealed from the orders of restitution.

## III

### The Mother's Appeal

#### A. Appealability

The Attorney General's office asserts that the mother's appeal should be dismissed on the theory that a parent has no right to appeal from a juvenile court order against a delinquent minor. Not so. Catherine certainly does have a right to appeal from the order against her. The Legislature contemplated that the liability of parents arising out of the application of section 730.7 would be civil liability, giving rise to a money judgment for "civil damages." Such money judgments are subject to the normal rules of appealability set forth in the Code of Civil Procedure. The issue was recently and squarely addressed in *In re Jeffrey M.* (2006) 141 Cal.App.4th 1017 [46 Cal.Rptr.3d 533] (*Jeffrey M.*) which held in the affirmative.[3]

We agree with the court in *Jeffrey M.* and take this opportunity to expound on its determination. Section 730.7 incorporates Civil Code section 1714.1 by reference. The relevant language from section 730.7 is: "(a) In a case in which a minor is ordered to make restitution to the victim or victims . . . a

---

[2] The text of the order is a little oblique, because it doesn't directly say that the mother is liable for $25,000. Could the language be read as merely a pro forma recitation of the statutory limit set forth in Civil Code section 1714? We conclude not. We read this order as intended to actually establish restitution liability on the mother's part at $25,000. The parties certainly understood as much. In a trial brief regarding restitution filed on both mother and son's behalf, it was asserted that attempts were being made even then to collect directly from the mother. And at the restitution hearing, the trial court commented that the mother was liable for the amount. (In a discussion about the "mother's liability" the court rejected application of the written release, saying that "the written release provided does not bar the court's setting of restitution beyond an amount of any civil release.")

[3] In *Jeffrey M.*, a juvenile court ordered the minor and his mother to be jointly and severally liable for a restitution order of about $5,000 arising out of a battery against a peace office (the

parent or guardian who has joint or sole legal and physical custody and control of the minor shall be rebuttably presumed to be jointly and severally *liable with the minor in accordance with* Sections 1714.1 and 1714.3 of the Civil Code for the amount of restitution, fines, and penalty assessments so ordered, up to the limits provided in those sections, subject to the court's consideration of the parent's or guardian's inability to pay." (Italics added.)

Civil Code section 1714.1 provides in pertinent part: "(a) Any act of willful misconduct of a minor which results in injury or death to another person or in any injury to the property of another shall be imputed to the parent or guardian having custody and control of the minor *for all purposes of civil damages* . . . ." (Italics added.) (Civ. Code, § 1714.3 is specifically targeted at firearm use by a minor under 18 years old, and likewise uses the phrase "for all purposes of civil damages" in imputing "[c]ivil liability" to "a parent or guardian having custody and control of the minor.")

■ A "purpose" of civil damages, of course, is a money judgment for those damages, and such a money judgment is appealable under Code of Civil Procedure section 904.1, subdivision (a)(1) when it is final.

■ Having found authority for the mother's appeal in section 730.7's incorporation of Civil Code sections 1714.1 and 1714.3 and their incorporation, in turn, of section 904.1 of the Code of Civil Procedure, we must make one further note. Section 800 of the Welfare and Institutions Code, which expressly gives minors the right to appeal, contains no language precluding parental appeals from section 730.7 judgments, or *limiting* such appeals to *only* minors. On its face the statute merely says a minor may appeal. Nowhere does it say that a directly affected parent may not appeal under some *other* statute where an appeal would otherwise be appropriate.

The sole authority relied on by the Attorney General's Office, *In re Almalik S.* (1998) 68 Cal.App.4th 851 [80 Cal.Rptr.2d 619], is factually distinguishable and not persuasive to the degree that it arguably can be read to conflict with *Jeffrey M. Almalik S.* involved a mother contending that her son's offense was not a felony, so no direct interest of the mother was implicated in the order from which she appealed. Given the natural presumption that minor children typically live with their parents, the parent was only indirectly affected. (In essence, the case involved a court order "grounding"

---

officer fell and injured a ring finger). The mother appealed from the order, and the appellate court entertained the merits of the appeal as against the argument that the mother did not have standing. The court held that "a parent has the authority to appeal to protect his or her own interests." (*Jeffrey M., supra,* 141 Cal.App.4th at p. 1021.) The *Jeffrey M.* court buttressed its conclusion by pointing to section 730.7, which allows a juvenile court to make a parent jointly and severally liable for a restitution order pursuant to section 1714.1 of the Civil Code, and further noted that judgments under section 1714.1 of the Civil Code are indeed appealable. (*Jeffrey M., supra,* 141 Cal.App.4th at p. 1021.)

the minor.) There was no order directly aimed at the parent's pocketbook. The cases that *Almalik S.* relied on, to say, basically, that the Code of Civil Procedure does not apply to juvenile court orders, were themselves cases which never addressed the issue of a monetary award against a parent under section 730.7 and cannot by any means be read to preclude parental appeals pursuant to section 730.7.[4]

We now proceed to the merits.

[4] An examination of the pedigree of the exclusivity language from *Almalik S.* shows that no court, other than *Jeffrey M.*, has yet actually considered the specific problem of appeals from juvenile court orders when they provide for a monetary judgment against a parent. Specifically, *Almalik S.* said: " '[T]he appealability of juvenile court orders is governed, not by the Code of Civil Procedure, but by the Welfare and Institutions Code.' " (*Almalik S., supra,* 68 Cal.App.4th at p. 854.) For that language *Almalik S.* cited *In re Sarah F.* (1987) 191 Cal.App.3d 398, 402 [236 Cal.Rptr. 480]. *Sarah F.*'s statement on that page (specifically, "the appealability of juvenile court orders is governed, by not the Code of Civil Procedure, but by the Welfare and Institutions Code. (§§ 395, 800.)") was made in the context of showing what the court in *In re Joshua S.* (1986) 186 Cal.App.3d 147 [230 Cal.Rptr. 437] (*Joshua S.*) had "correctly pointed out." (*Sarah F., supra,* 191 Cal.App.3d at p. 402.) (Though the *Sarah F.* court did not provide a page reference in *Joshua S.* for its statement, the reference can be found at page 150 of the *Joshua S.* opinion, at 186 Cal.App.3d.) But the holding in neither case ruled out the idea of parental appeals in cases where the parent would have a direct interest affected by the order and the subject matter of the order was not otherwise preempted by the Welfare and Institutions Code statute itself. In both *Sarah F.* and *Joshua S.* the parent was indeed allowed to appeal. (*Sarah F., supra,* 191 Cal.App.3d at pp. 402–404 [parent had standing to appeal a juvenile court order referring a matter for a hearing under Civil Code section 232 terminating parental rights]; *Joshua S., supra,* 186 Cal.App.3d at p. 155 [mother allowed to appeal from dependency order also referring matter out for section 232 proceeding].)

*Joshua S.* cited only the two Welfare and Institutions Code appealability statutes (§§ 395 and 800), and *In re Corey* (1964) 230 Cal.App.2d 813, 821 [41 Cal.Rptr. 379] for the idea that "the Code of Civil Procedure section [the court was referring to section 902] is inapplicable to questions surrounding the appealability of a juvenile court order." (*Joshua S., supra,* 186 Cal.App.3d at p. 150.)

*In re Corey* was a juvenile delinquency case, in which a minor was adjudicated a ward based on a finding he had committed robbery. While his appeal was pending from that order, the minor brought, in the trial court, a petition to set aside the not-yet-final judgment of wardship on the grounds that another person was really responsible for the robbery. The set-aside petition was denied, and the minor appealed from the order of denial—his second appeal. The county probation officer, as respondent, sought to have the second appeal dismissed because the Code of Civil Procedure only authorized appeals after final judgments, and the first judgment, not yet final, could therefore not support an appeal from the denial of the set-aside order. (*In re Corey, supra,* 230 Cal.App.2d at p. 820.) However, a parallel provision in section 800 provided for appeals from orders after judgments, omitting the "final" in the "final judgment" provision in the Code of Civil Procedure statute. (See *ibid.*) It was in the context of the conflict between the Welfare and Institutions Code statute and the Code of Civil Procedure statute that the *In re Corey* court declared that the former controlled. (*In re Corey, supra,* 230 Cal.App.2d at p. 813.) The point was *not* the inherent exclusivity of the Welfare and Institutions Code appealability statutes. Rather, it was that those statutes trumped *conflicting* Civil Procedure statutes "under the rule that a special statute dealing expressly with a particular subject controls and takes priority over a general statute." (*Id.* at p. 821.) *In re Corey* is the end of the line of the exclusivity language on appeals.

## B.   The Merits

### 1.   *The Effects of the Settlement*

California's restitutionary legislation derives from a constitutional provision, commonly known as Proposition 8, now article I, section 28 of the State Constitution, added by initiative in 1982. Subdivision (b) of section 28 addresses restitution, and in pertinent part provides: "It is the unequivocal intention of the People of the state of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from *the persons convicted of the crimes* for losses they suffer. [¶] Restitution shall be ordered *from the convicted persons* in every case . . . ." (Italics added.)

The main juvenile restitutionary statute directed at the juvenile offender himself or herself, section 730.6, is considered to be legislation implementing the restitutionary provisions of Proposition 8. (See *Tommy A., supra,* 131 Cal.App.4th 1580, 1587 ["Section 730.6 is one of the implementing statutes."].)

By contrast, the statute directed at the custodial parents of juvenile offenders, section 730.7, does not implement Proposition 8 with its focus on the "convicted" person. Rather, section 730.7 is a procedural variation on the theme of vicarious *civil tort* parental liability articulated in Civil Code section 1714.1, which was first enacted in 1955, well before Proposition 8. As explained by *Jeffrey M.,* section 730.7 was "intended to transfer the vicarious liability policy endorsed by Civil Code section 1714.1 to juvenile court proceedings, in part, so that victims of a crime committed by a minor may seek restitution from the parents without the need for a separate independent civil action." (*Jeffrey M., supra,* 141 Cal.App.4th at p. 1025.)

The way that the law treats offending minors as regards a release provided by a victim is instructive. The issue was recently explored in *Tommy A., supra,* 131 Cal.App.4th 1580. *Tommy A.* involved a car accident. The car was driven by a friend of the offender's mother. The friend's insurer paid the victim for her economic losses and the victim expressly released both the friend and the juvenile offender from liability for all claims arising out of the accident. Even so, the juvenile court ordered the offender to pay the same amount in restitution to the victim as a condition of probation. The minor appealed, attacked the restitution award, and pointed to the settlement. The *Tommy A.* court gave three reasons why the settlement did not release the offender from his obligation:

(1) The settlement came from the friend's insurer, a source " 'completely distinct and independent' " of the offender and the payment did not satisfy the requirement in 730.6 that restitution come " 'directly from [the] minor.' " (*Tommy A., supra,* 131 Cal.App.4th at p. 1590.)

(2) The state was not a party to the settlement, and the state's interest in having the minor "satisfy a 'rehabilitative and deterrent debt to society' " under Proposition 8 could not be released by the victim. (*Tommy A., supra*, 131 Cal.App.4th at p. 1591, quoting *People v. Bernal* (2002) 101 Cal.App.4th 155, 162 [123 Cal.Rptr.2d 622] (*Bernal*).)

(3) Release would not recognize the general "importance of the rehabilitative and deterrent goals of restitution." (*Tommy A., supra*, 131 Cal.App.4th at p. 1591, citing *Bernal, supra*, 101 Cal.App.4th at pp. 161–162.)

These reasons from *Tommy A.* simply do not apply to a case of vicarious liability provided for in section 730.7 against the offending minor's custodial parent.

■ In the first place, it was the mother here, Catherine, who obtained the homeowners insurance that paid the school a sum in return for its release of all claims against her. In the context of vicarious parental liability under section 730.7—as distinct from direct offender liability under section 730.6—there is no statutory requirement that all payments come "directly from" the party against whom the restitutionary order is made, and in fact the court in *Bernal* held that an offender's insurer's payments *did* constitute payments directly from the offender. (See *Bernal, supra*, 101 Cal.App.4th at pp. 167–168 ["We conclude that" the " 'directly from' " language of Pen. Code, § 1202.4, subd. (a)(1) "includes payments by an insurance company insuring the defendant"].) And Catherine, unlike the defendant in *Bernal*, is only vicariously liable, undercutting a fortiori any application of the *Tommy A.* "directly from" prong to the facts at hand.[5]

Second, the state's interest in rehabilitation is not implicated by a release of vicarious liability against an otherwise innocent parent. The parent does not need rehabilitation. And the state's interest in deterrence is only tangentially implicated at most. The interest in deterring bad conduct on the part of potential juvenile offenders is not implicated at all. (In the next portion of this opinion, for example, we will uphold the entirety of the some $127,000 restitution award against the minor Michael.) And any secondary interest of the state in having parents control the behavior of their children is only marginally implicated. It is implicated only by the degree to which a parent who has insurance against the possibility of vicarious liability originating in the acts of his or her children will be marginally less controlling of those children in contrast to a parent who, in malpractice insurance parlance, "goes bare."

---

[5] Section 730.7 contains a provision, subdivision (e), which provides that nothing in it "shall be construed to make an insurer liable for a loss caused by the willful act of the insured or the dependents of the insured pursuant to Section 533 of the Insurance Code." The provision, however, hardly means that insurers won't pay on behalf of parents. (See *Arenson v. Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 83–84 [286 P.2d 816] [holding that insurer had duty to defend and indemnify father whose minor son started a fire on school property].)

Students of insurance law will, of course, recognize that what we are talking about here is the old problem of "moral hazard," meaning the degree to which human beings tend to relax when they have an insurer backing them up. But the moral hazard problem is inherent in all insurance, and therefore of weak force, as illustrated by the instances where public policy *encourages* people to obtain insurance precisely in order to assure that victims of torts will be compensated for their losses. The example that most readily comes to mind is the financial responsibility law that requires all motorists obtain insurance (see Veh. Code, §§ 16020, 16028), but there are also other statutes which have the direct or indirect effect of promoting the availability of liability insurance. Those include statutes seeking to ensure that property insurance is available to those who desire it (see *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 564 [53 Cal.Rptr.2d 878], finding policy in Ins. Code, § 10090 et seq.) and regulating notices of cancellation so that individuals have the opportunity to procure substitute insurance (see *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1122 [100 Cal.Rptr.2d 246], finding policy in Ins. Code, § 677.2).

Indeed, while we are on the subject of the state's interest, we need only look at this case from a different angle to realize the deleterious public consequences that would flow from a holding that a vicariously liable parent could *not* obtain a release of section 730.7 liability by virtue of an insurer's payment. Such a rule would effectively deprive parents of the ability to insure against the risk of vicarious liability as a result of those torts of their children that implicated the criminal justice system. And that would also mean that many *victims* would not be paid at all, ever, since we may take it as a given that many parents of juvenile offenders as well as the offenders themselves are "judgment-proof" without insurance.

What we have just said about the second reason given in *Tommy A.* for refusing to recognize a release that includes the juvenile offender (the absence of the state as a party) applies equally to the third prong in *Tommy A.* (the state's general interest in rehabilitation and deterrence). On top of all of this, we find in the structure of section 730.7 itself an indication that the Legislature did not intend to preclude the operative effect of releases of vicariously liable parents given by victims of their children's torts.

██ A close reading of the text of section 730.7 indicates a potential for *compromise* in the litigation of a parent's vicarious liability for the child's restitutionary obligation. We note: Section 730.7 does not establish a conclusive presumption of joint and several custodial parental liability for the child, only a rebuttable one. The pertinent language is: "a parent . . . who has joint or sole legal and physical custody and control of the minor shall be rebuttably presumed to be jointly and severally liable . . . ." That is, the statute contemplates the right of a parent to litigate the issue of his or her

actual liability, albeit with a presumption of liability going in. The statute also contemplates the right of a parent to litigate the issue of his or her ability to pay any restitution award. The pertinent language is: "with the minor in accordance with Sections 1714.1 and 1714.3 of the Civil Code for the amount of restitution, fines, and penalty assessments so ordered, up to the limits provided in those sections, subject to the court's consideration of the parent's or guardian's inability to pay." (§ 730.7, subd. (a).)

The possibility of litigation over such issues—particularly "judgment call" issues such as ability to pay—implicates the possibility of compromise. Is the statute to be read in a way that would preclude a district attorney's office, in a case such as this, from compromising the issue of a parent's liability to pay to some figure below $25,000?[6] *Not* to recognize a release obtained for an insurer's payment effectively precludes compromise. We cannot believe that the Legislature intended that.

Further, perversely, such a rule would encourage insurers to *delay* any payment to victims until they could obtain consent from the local prosecutor's office and a release of liability from that office. Under such a rule, only by involving the prosecutor in any settlement (the equivalent of involving the state in the *Tommy A.* context) would the insurer have a chance of obtaining a meaningful release on behalf of the insured parent. (And what if the prosecutor and the victim disagreed, with the victim wanting compensation immediately while the prosecutor held out for some higher figure?) A rule refusing to recognize a release given by a victim in return for a payment from a parent's insurer would effectively penalize the victim and prevent insurers from performing their duties of effectuating "prompt" settlements of claims when liability is "reasonably clear" pursuant to Insurance Code section 790.03, subdivision (h)(5).

Finally, there is the potential for injustice when one looks at the issue in terms of the victim. Nonrecognition of a release puts *victims* in the awkward position of not being able to make good on their word to a party that did not engage in any wrongdoing and to which the requirements of Proposition 8 do not apply. That makes no sense, and there is nothing in the Constitution or statutes to require such an unseemly result.[7]

In the case before us, for example, a lawyer for the school district bargained with Catherine's insurer and gave a release to her. That release

---

[6] Catherine did not make such an assertion in the trial court here. Whether she might have under the facts in this case (she is a single mother working as a school bus driver) is a matter of speculation.

[7] At oral argument, Catherine's attorney briefly alluded to the general topic of estoppel, pointing out that both the county and the school district are subdivisions of the State of California. However, the topic was never developed in the brief; it is therefore waived.

ought to be worth something. While, under *Tommy A.* and *Bernal*, the release might not be any good against the defendant himself, there is no reason not to recognize it as regards a party only vicariously liable.

■ We should add that there is nothing in the actual text of section 730.7 providing that a parent *cannot* be released by a third party. The text merely states that a parent "shall be rebuttably presumed" to be jointly and severally liable for certain reasons. A presumption of liability, however, cannot reasonably be translated into a preclusion against any and all releases of liability. It would be a misreading of that text to say that it precludes a release of any parental liability by the victim. The rule against release of the minor's liability by the victim as articulated in *Tommy A.* was based on the text of section 730.6 and policy concerns (see *Tommy A., supra*, 131 Cal.App.4th at pp. 1590–1592), not any language in section 730.7.

The order making Catherine jointly and severally liable in any amount for the restitution award against her son Michael must therefore be reversed.

### 2. *The Abstract of Judgment*

Obviously, in light of our determination that the release effectively precludes any section 730.7 liability against Catherine, the abstract of judgment recorded by the County of Orange has no validity. However, in light of the county's recording an abstract of judgment against Catherine for more than the amount of the restitution order *against her*, some comment is required.

■ By its terms, section 730.7 provides for parental liability only "up to the limits provided in" Civil Code sections 1714.1 and 1714.3. The current limits set forth in Civil Code section 1714.1 are $25,000 "for each tort of the minor."[8] (Under subd. (c) of § 1714.1 of the Civ. Code these limits are to be adjusted every two years; the current limits in Civ. Code, § 1714.3 are now $30,000 "as a result of any one occurrence or, subject to the limit as to one person," and $60,000 "for injury to or death of all persons as a result of any one such occurrence." Since it governs firearm use, Civ. Code, § 1714.3 is not applicable to the case before us.)

There is no argument that Michael's holding the lighter to the pad and rug constitutes anything but a single tort. As such, the maximum liability that even might possibly have been assessed against Michael's mother Catherine

---

[8] The second paragraph of Civil Code section 1714.1, subdivision (a) provides: "Subject to the provisions of subdivision (c), the joint and several liability of the parent or guardian having custody and control of a minor under this subdivision shall not exceed twenty-five thousand dollars ($25,000) for each tort of the minor, and in the case of injury to a person, imputed liability shall be further limited to medical, dental and hospital expenses incurred by the injured person, not to exceed twenty-five thousand dollars ($25,000). The liability imposed by this section is in addition to any liability now imposed by law."

was $25,000. And in fact that was precisely the trial court's order. The trial court's order stated plainly: "Pursuant to Civil Code 1714, maximum liability for the mother is set at $25,000.00." Clearly, the abstract should never have been applied for or issued in the first place in any amount greater than $25,000 because it was *that* figure which was the true "total amount of judgment" entered *against Catherine* as "judgment debtor."

█  A judgment lien "is created . . . by recording an abstract of a money judgment with the county recorder." (Code Civ. Proc., § 697.310, subd. (a).) Such a lien "is a lien for the amount required to satisfy the money judgment." (Code Civ. Proc., § 697.010.) It follows, then, that an abstract of judgment filed pursuant to section 674 of the Code of Civil Procedure which gives the "name and last known address of the judgment debtor" and the "amount of the judgment or decree as entered" (Code Civ. Proc., § 674, subd. (a)(3), (5)), must be for the amount of the judgment specifically against that judgment debtor, not more. Then again, such a conclusion—that an abstract of judgment cannot indicate a liability on the part of a judgment debtor in excess of the judgment creating that liability in the first place—is only common sense anyway.[9]

## IV

### *The Son's Appeal*

It is important to understand exactly what son Michael is contending in this appeal. In light of *Tommy A.* and *Bernal*, Michael does not argue that the release obtained by his mother's insurer exonerates him from any restitutionary award. Rather (as the point was refined in oral argument), he asserts that in light of the payment, the award should expire upon the expiration of his wardship. He raises the specter of a "residual" civil judgment that will "economically cripple" him "well into adulthood, if not for life." Statutorily, Michael has framed his argument in terms of subdivision (h) of section 730.6, which provides that restitution to victims "shall be imposed in the amount of the losses" and the "court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record."

█  Did Michael present such "compelling and extraordinary reasons" here? We conclude the answer is no. Subdivision (i) of section 730.6 provides that an order of restitution to a victim "shall be enforceable as a civil judgment." The language is a clear indication that the Legislature envisioned the liability of the juvenile offender continuing on into adulthood—civil judgments may be enforced for 10 years (Code Civ. Proc., § 683.020 [basic

---

[9] When the issue of the abstract of judgment arose at oral argument, the deputy attorney general arguing the case speculated about possible further proceedings that might have entailed more liability on Catherine's part. But that did not happen. On the record before us, a county collection officer simply applied for an abstract of judgment in excess of what the judgment debtor owed pursuant to the judgment itself.

10-year period to enforce judgments]) and renewed anytime in those 10 years (Code Civ. Proc., § 683.120 [procedures for renewing judgments]). The fact that a juvenile delinquency restitution order may extend into adulthood and easily beyond the period of wardship then can hardly be called a "compelling" reason to depart from a rule of full restitution. Extension of juvenile offender liability into adulthood is what one would *expect* under the language of subdivision (i) of section 730.6.

■ That leaves only the bare fact of the release obtained by Michael's mother's insurer, independent of the extension of the restitution order into Michael's adulthood. We have already discussed why a release should protect a parent only vicariously liable. Among our reasons is the law's encouragement of obtaining liability insurance so that *victims* will be compensated. But that factor cuts the other way for the liability of the juvenile offender. It is clear from the statute that "full restitution" will be the usual, "ordinary" order. Proposition 8 itself uses the phrase "compelling and extraordinary" to describe a judge's latitude to depart from an order of restitution. (Cal. Const., art. I, § 28, subd. (b).) Under section 730.6, departures from "full restitution" must be justified by clear and compelling reasons stated on the record. What one hopes will be the *normal* situation—victims receiving payment from the offender's parent's insurer to protect the parent from vicarious liability—can hardly be called so extraordinary as to be compelling.

Moreover, under the facts of the case before us, the disproportionately small percentage of the victim's actual losses actually covered affirmatively demonstrates the lack of any compelling reason to depart from a norm of full restitution. The insurer paid less than $12,000 in settlement against an actual loss exceeding $138,000.

We note that the trial court has already credited Michael with the amount of the insurer's payment, reducing Michael's restitution obligation to around $127,000. (Cf. *Bernal, supra*, 101 Cal.App.4th at pp. 167–168 [because payment made by adult offender's insurer was " 'directly from' " offender, payment by insurer could be used by offender as an offset of his restitution obligation]; § 730.6, subd. (i) ["Restitution collected pursuant to this subdivision shall be credited to any other judgments for the same losses obtained against the minor . . . arising out of the offense . . . ."].) Perhaps, had the insurer paid the entire amount of the actual loss, there might be a "compelling" reason not to order "full restitution," since at that point the state's constitutional interest in full restitution would have been satisfied, and all future recovery by the victim would represent a double recovery. (See *Bernal, supra*, 101 Cal.App.4th at p. 167.) Maybe under such circumstances the trial court could adjust any restitution award against Michael strictly in terms of his own ability to pay (present and future) and the state's interest in deterrence and rehabilitation. But that scenario is not this case. This case

involves a substantial uncovered loss by the victim as against a statutory default rule of full restitution aimed at the juvenile offender.[10]

## V

### Disposition

The order is reversed to the extent that it provides for any liability at all imposed on mother Catherine S. The trial court is directed to enter a new order stating that Catherine S. is not liable for any part of the restitution award assessed against Michael. Catherine shall also recover her costs on appeal if she has incurred any. The abstract of judgment, of course, should be expunged, or even better, voluntarily withdrawn by the county. (The parties, however, will have to initiate their own action in that regard.)

On the other hand, the order is affirmed as it relates to Michael.

Bedsworth, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied March 23, 2007, and the opinion was modified to read as printed above.

---

[10] We do not read section 730.6, subdivision (h)'s language requiring restitution "in the amount of the losses" unless there are "compelling . . . reasons for not doing so" to be an all-or-nothing proposition. Given the state's independent interest in the rehabilitation and deterrence of juvenile offenders, one could posit that a juvenile offender might still be required to pay something to a victim as restitution despite the victim's having already received a payment from an insurer fully compensating the victim for all its losses, i.e., a crime victim might indeed receive at least some double recovery. Arguably *Bernal* might be distinguished under such circumstances because the juvenile offender had not procured his or her own insurance, and therefore the payment would not be "directly from" the offender. But these are speculations that need not be developed further in this case. In this case, given that the payment in this case was only a small fraction of the victim's actual loss (less than 10 percent in fact) and the restitution award is only for the remainder, the issue does not arise.